# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| DAVID COLLINS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 2:09-cv-01824-WY |
| | : | |
| ALLSTATE INSURANCE COMPANY, | : | |
| Defendant. | : | |
| | : | |

**Memorandum**

YOHN, J.                                                                                                                                             June __, 2010

       Plaintiff, David Collins, sued defendant, Allstate Insurance Company, for breach of an insurance contract (Count I) and bad faith (Count II) based on Allstate's refusal to cover all of the alleged damages a storm caused to Collins's house (the "Property"). Allstate moved for partial summary judgment on both counts as to Allstate's refusal to pay for replacement of the entire roof of the Property. The court denied Allstate's motion as to Count I. Pursuant to Collins's request under Rule 56(f), the court also denied the motion as to Count II without prejudice to the right to renew it after Collins conducted additional discovery. Now that Collins has conducted such discovery, Allstate has filed a renewed motion. Allstate argues that there is no evidence in the record to establish that it acted in bad faith when it only agreed to pay for repairs to the damaged portions of the roof. Collins argues that genuine issues of material fact exist as to Count II because Allstate: (1) intentionally treated coverage of the interior of the Property differently from the exterior; and (2) placed its own interests above his. The court concludes that there is no evidence in the record to establish that Allstate acted in bad faith. The court will therefore grant Allstate's renewed motion and will enter summary judgment in its favor as to Count II.

I.  **Factual and Procedural Background**

The facts of the instant case, which I view in the light most favorable to Collins, the non-moving party, are as follows.

Collins alleges that on March 8, 2008, wind and rain from a storm caused sudden and accidental direct physical loss to the Property in the following areas: (1) the slate roof of the Property; (2) the exterior left side; (3) the interior third-floor attic, hall, stairs, and right-side room; (4) the interior second-floor closet, stairwell, rear bedroom, and right-side middle bedroom; and (5) the interior main-floor foyer. (Def.'s Am. Statement of Undisputed Facts ("Def.'s Am. Stmnt. of Facts") ¶ 20.) Collins alleges that Allstate is liable for the cost of repairing all of the alleged damages based on a homeowner's insurance policy he purchased from Allstate. (Compl. ¶ 5.) The Policy requires Allstate, in the event of a covered loss, to "repair, rebuild or replace all or any part of the damaged, destroyed or stolen property with property of like kind and quality within a reasonable time" or to reimburse the insured for the repair costs of "equivalent construction for similar use" up to the applicable limit of liability. (Answer Ex. A.)

After Collins notified Allstate of the loss, Allstate assigned Pilot Catastrophe Services, Inc., and one of Pilot's adjusters, Patricia Lynn Camp, to investigate plaintiff's claim. (Def.'s Am. Stmnt. of Facts ¶ 21.) On May 16, 2008, based on Camp's inspection of the home, Allstate prepared an initial estimate of damages to the exterior and interior of the house, calculating gross repair costs to be $13,265.42 for restoration of: (1) the damaged sections of the roof, but not replacement of the roof in its entirety; (2) the third-floor hallway, stairwell, den/storage room, and attic; (3) the second-floor closet, hallway, and middle and rear bedrooms; and (4) the main-floor foyer. (Id. ¶ 23.) Based on this estimate, and after applying the $500.00 deductible and $2,202.52 in depreciation, Allstate issued a check for $10,562.90 to Collins. (Id. ¶ 24.)

Allstate also hired Doug Weiss of Rainmasters, Inc., to inspect the Property with Alan Duddy, an adjuster from Allstate who replaced Camp when she left the Philadelphia area. (Id. ¶¶ 27-28.) During his December 1, 2008, inspection of the exterior of the Property, Duddy noticed that "there was no uniform appearance" on the roof of the Property that he could see from the ground. (Def.'s Mem. Ex. G ("Duddy Dep.") 67:15-24.) On December 2, 2008, Weiss reported the following observations:

(1) "The slate shingles on this home are old";
(2) "There have been previous repairs to the slate roofing";
(3) There was a "recent repair to the front upper left corner of the roof. It appear[ed] two or three new slates were installed";
(4) There was "no other damage which could be considered wind damage";
(5) "There [were] some cracked slates and chipped slates throughout the roof. This [was] the result of ice and snow over an extended period of time."

(Def.'s Am. Stmnt. of Facts ¶ 30.) Weiss concluded as follows:

> Slate roofing which is in this aged condition needs annual maintenance to repair winter damage. Not all cracked and chipped slates necessarily need to be replaced. If they do not allow water to infiltrate the home, they are not normally replaced.

(Id.) After he received Weiss's report, Duddy determined that there was no basis for a revision to the estimate of repair costs that Camp had prepared. (Id. at ¶ 31.)

Collins hired Alliance Adjustment Group, a public adjusting company, to handle his claim. (Pl.'s Am. Counterstatement of Undisputed Facts ("Pl.'s Am. Stmnt. of Facts") ¶ 71.) James Wagner, president of Alliance, estimated that it would cost $53,225.56 to restore the Property, including $22,000 to replace the entire roof. (Id. ¶ 72.)

Although Allstate did not cover the replacement of the entire roof, it covered the replacement of entire sections of other portions of the Property. For instance, Allstate covered the painting of the entirety of the ceilings in the second-floor middle bedroom and hallway and main-floor foyer, even though only a portion of these ceilings was damaged and even though

certain portions were suffering from "old" damages.  (Id. ¶¶ 45-48, 58-61.)  In fact, Allstate's estimate of damages included notations stating that painting of undamaged sections was necessary to "match" the damaged portions so that, for example, all the paint in a room would be "one color."  (Id. ¶ 53.)  In addition, Allstate covered the refinishing of entire sections of the floors of the Property to ensure uniformity.  (Id.)  Allstate also agreed to replace all the wallpaper in the third-floor hallway, stairwell, and den/storage area even though the storm did not cause damage to all of the wallpaper.  (Id. ¶¶ 55-57.)

Collins filed this case on February 27, 2009, in the Philadelphia County Court of Common Pleas, and Allstate removed it to this court on April 30, 2009.  (Def.'s Am. Stmnt. of Facts ¶¶ 1-2.)  On May 6, 2009, the court referred the case to arbitration, set a deadline for motions for summary judgment of thirty days prior to the arbitration date, and ordered that no discovery would be allowed after the arbitration without leave of court.  (Docket No. 5.)  On May 12, 2009, the arbitration date was scheduled for September 15, 2009.  (Docket No. 6.)

Allstate deposed Collins on August 3, 2009.  (Def.'s Am. Stmnt. of Facts ¶ 25.)  Collins testified that not all of the roof was damaged in the March 8, 2008, storm and not all the shingles came off.  (Def.'s Mem Ex. O ("Collins Dep.") 37:10-38-4.)  He testified that he never had any communications with anyone at Allstate and had no evidence that "anybody at Allstate [had] any ill will" toward him.  (Id. at 59:9-13.)  He also testified that he had not made any repairs since the March 8, 2008, storm because he "didn't get enough money to replace the roof" and instead placed the money in the bank and used the money for the heating bill.  (Id. at 38:18-42:4.)[1]

---

[1] Collins submits an invoice, however, that reflects that some emergency repairs were made on March 26, 2008, in which the slates that were "blown off roof" in the storm were "temporarily replaced" for $375.00.  (Pl's Am. Stmnt. of Facts. ¶ 29, Ex. B.)

- 4 -

Allstate timely filed its original motion for partial summary judgment (the "original motion") on August 14, 2009. (Docket No. 8.) Collins filed his opposition to the original motion on August 26, 2009. (Docket No. 9.)[2] He attached to his opposition an affidavit from Wagner in which Wagner explained his recommendation that the entire roof needed to be replaced. (Id., Ex. B ("Wagner Aff.").) According to Wagner, the entire roof needed to be replaced because "there are no slate tiles currently available on the market that are sufficiently similar in color, size and texture, to those on the Collins home at the time of the loss so as to make them of 'like kind and quality' or 'equivalent construction' as required under the terms and conditions of the policy." (Wagner Aff. ¶ 12.) Wagner stated that the repair method that Allstate selected as an alternative to replacing the entire roof would have resulted "in a disruption of the uniform and continuous exterior décor of the home." (Id. ¶ 13.) Wagner further stated that repairing only the damaged portion of the roof "would result in a different appearance on the roof than the one that . . . existed prior to the time of the loss and would not place [the Collins family] back into the position they were in prior to the time of the loss." (Id. ¶ 14.) Wagner also stated that in his past experience handling hundreds of damage claims involving Allstate that "Allstate has agreed to pay to match continuous decorations." (Id. ¶ 15-16.) Wagner further stated that it is the "custom and standard" of the insurance industry "to pay for areas that are not damaged, but of continuous and uniform color, pattern, texture and material." (Id. ¶ 17.)

Collins also requested leave, pursuant to Rule 56(f), to conduct additional discovery. (Docket No. 9.) At the time, Collins had not deposed any representatives of Allstate. As part of his request for leave to conduct additional discovery, he submitted an affidavit from one of his

---

[2] On September 9, 2009, the parties requested and received a cancellation of the arbitration pending resolution of the original motion. (Docket No. 11.)

attorneys, Steven C. Feinstein, that states that Allstate "filed its Motion for Summary Judgment before we had the opportunity to take depositions of any of the Allstate personnel who handled the file." (Id., Ex. A ("Feinstein Aff.") ¶ 3.) Feinstein stated that were he given the opportunity to depose a representative of Allstate, he would inquire about the following topics: (1) "the carrier's custom and practice of matching materials on undamaged portions of the home in order to place the insured back into the position he was in prior to the loss"; (2) "the reasons that Allstate adjusted the interior damages of Mr. Collins' home in a different manner [than] it adjusted the exterior portion of the home"; (3) whether the adjusters who handled plaintiff's claim participate in a profit-sharing plan that Allstate offers "and how that affected the adjustment of the Collins claim"; and (4) the training that Allstate's adjusters in this case received regarding Allstate's alleged plan in the 1990s "to increase its profitability at the expense of its insured, using various strategies to delay and deny payments . . . and how it affected the adjustment of the Collins claim." (Feinstein Aff. ¶¶ 5-8.)

On December 10, 2009, the court denied summary judgment as to Count I because there was a genuine issue of material fact as to whether the Policy required Allstate to pay for the replacement of the entire roof of the Property. (Docket No. 13.) The court granted Collins's Rule 56(f) motion as to Count II because Collins was technically correct that discovery was still open at the time that Allstate filed its original motion. (Id. at 11.) The court noted, however, that Collins's delay in seeking depositions of Allstate's representatives was "very troubling." (Id.) Feinstein had not explained why he did not take advantage of his opportunity to depose an Allstate representative before Allstate filed its original motion, or why he did not move, before the deadline for filing motions for summary judgment, to extend the time for discovery and to postpone the arbitration hearing. (Id. at 10-11, 11 n.5.) The court nevertheless granted Collins

the opportunity to conduct the discovery he sought.  (Id. at 12.)  The court did not address the merits of Collins's bad-faith claim.

Collins deposed Duddy on January 19, 2010.  (See Duddy Dep. 1.)  Duddy testified that Allstate's methods for determining coverage for interior and exterior damages "depend on the actual claim, the particular type of item you're talking about, industry standards, whether you're talking a component item versus a run of carpet versus floor, tile."  (Id. at 111:11-23.)  He testified that "[t]here's a whole host of things that go into that determination."  (Id. at 111:23-24.)  He testified that for claims such as this one, he would review "quite a few criteria," including "the type of roofing material, the age, the condition, the amount of damages," as well as "availability of a type of material," "the number of slopes that were damaged," and "the extent of damages per slope."  (Id. at 22:14-25:3.)  He concluded that his process to decide such a claim would depend on "the specific claim" and the "type of claim."  (Id. at 28:20-29:3.)  He stated that Allstate's policy does not allow him to "decide which repair method you're going to utilize based upon the cost."  (Id. at 34:8-20.)  When asked if he could "think of any other reason why Allstate would refuse to replace the entire roof other than the sheer cost of it" Duddy answered, "Can I think of any other reason on this claim, no"—and clarified in his errata sheet that "Allstate did not refuse to replace the roof based on cost" but rather "paid for all the direct physical damage to the roof related to this loss."  (Id. at 52:15-19; Errata Sheet.)  He also testified that although there are industry standards in the construction industry with regard to repair methods to the exterior and interior portions of a home, the industry standards are "not so much from the insurance standpoint."  (Id. at 112:3-9.)[3]

---

[3] Duddy also testified in his deposition that he participates in a 401K retirement plan through which he receives some Allstate stock, but that his participating in this 401K retirement plan "doesn't even enter into adjusting the claim" and that he does not have "direct knowledge"

Meanwhile, on January 17, 2010, engineer and contractor Gary Popolizio of GLP Construction Management, on behalf of Allstate, conducted a "curb side" inspection of the exterior of the Property. (Def.'s Am. Stmnt. of Facts ¶ 36.) Popolizio submitted a report on February 16, 2010, in which he stated that: (1) the slate tiles on the roof "showed evidence of long-term age decomposition, flaking, and cracks as well as multiple older repairs, replacement[,] and caulk joints; (2) many of the multiple repairs on various slopes of the roof "showed signs of aging and weathering"; (3) "[t]wo types of slate shapes were observed on the front roof slope": "chamfered shaped slates" (slates with the edges cut at forty-five degrees) used as decorative pieces in "[a] series of 4-rows and 3-rows" and square-edged slates; (4) "[r]epairs to portions of these shingles were noted that interrupted the decorative pattern on the roof"; (5) on the upper-left corner of the front slate roof, one to two new-looking slate pieces were in place at "the edge of the roof rake" where "[a] repair to the painted wood rake board" had "rotted away"; and "[r]ust streaks were visible on most of the slate surface emanating from the metal ridge cap." (Id. at Ex. Q-1 ("Popolizio Report").) Popolizio confirmed his statements with photographs. (Id.)[4]

---

of "whether the amount of money that Allstate pays out on claims affects their overall profitability for the purposes of affecting their stock value." (Id. at 99:15-22; 100:24-101:6.) He further testified that he did not recall being told at any time—in training or otherwise—that Allstate was changing the method by which it would pay claims, was paying too much money on claims, or had to become more profitable. (Id. at 103:23-105:13.) He testified that he was never told he needed to become more aggressive in how he adjusted claims, that he needed to scrutinize certain claims more closely, that certain types of claims should be handled differently from others, or that he should target claims under a certain value and adjust them differently. (Id.)

[4] Collins states that because the Popolizio Report was filed at the same time as Allstate's renewed motion, he has not had the opportunity to depose Popolizio. (Pl.'s Resp. ¶ 7.) In any event, he has not disputed the accuracy of the photographs submitted with the Popolizio Report.

Popolizio also noted that the "differences in color, tone, texture[,] and appearance across the roof surface" of the Property "exemplifies the lack of 'uniformity' that creates the 'beauty' of a natural stone product." (Id. ¶ 38.) He concluded that "[t]hese variations clearly existed on the roof prior to March 8, 2008," and disagreed with Wagner's conclusion that a repair to only portions of the roof would disrupt the appearance. (Id.) He also concluded that "industry accepted repair techniques" used for a building's interior are not analogous to those for the exterior, because they depend on a number of factors such as "the form of the material purchased, the application of the product[,] and the practical application of the repair." (Id.) He further concluded that "[t]he practice of differentiation between interior and exterior repairs is widely used and accepted within the repair and construction industry." (Id.)

On February 19, 2010, Allstate filed its renewed motion. (Docket No. 16.) Collins filed his response on March 9, 2010. (Docket No. 17.)[5]

## II. Standards for Summary Judgment

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this initial burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). In

---

[5] On February 2, 2010, the court had scheduled an arbitration for April 8, 2010, which the court canceled on March 25, 2010. (Docket Nos. 15, 18.)

evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III. Discussion

Allstate argues that Collins "does not meet his burden of proof" as to his bad-faith claim because "the boiler plate averments in his Complaint concerning the bad faith allegations are not supported with facts and the record before this Court does not support these allegations." (Def.'s Mem. at 7-8.)  Allstate argues that, in the additional discovery the court permitted Collins to conduct, Collins failed to elicit evidence to support his claim.  (Id. at 8.)  Allstate argues that Collins "has failed to produce any evidence of willful misconduct or unreasonableness" on the part of Allstate and that Collins has failed to produce any evidence that Allstate treated him "with reckless indifference and disregard under the circumstances."  (Id. at 18, 21.)  Collins responds that Allstate acted in bad faith because the Policy required Allstate to place him back in the position he was in prior to the time of the loss by ensuring that he had a uniform roof. (Id. at 7.)  Collins relies almost exclusively on the testimony of Duddy, Allstate's witness.[6]

---

[6] Allstate further argues that the only dispute in the case is a contractual dispute as to the amount Allstate should have paid under the terms of the Policy for repairs to the Property. (Id. at 17.)  According to Allstate, the language of the Policy only required it to repair or replace damages to the Property with materials of "like kind and quality" or to pay the cash equivalent. (Id.)  Allstate argues that "like" can be defined as "similar" and that therefore Allstate was not required to pay for replacement with exactly the same kind of materials. (Id. at 17-18.)

Collins argues that Allstate's interpretation of the Policy was unreasonable and in bad faith. (Pl.'s Mem. 6.)  He argues that Duddy admitted that the Policy is ambiguous where it requires payment for repairs of "equivalent construction" with material of "like kind and quality," and that it was bad faith for Allstate to interpret the Policy using the definitions of these terms most favorable to Allstate. (Id. at 8-9.)  Allstate argues—without accepting Collins's argument that the Policy is ambiguous—that incorrect contractual interpretation is not, in and of itself, evidence of bad faith. (Def's. Mem. 19-20.)

The court concludes that Collins has not produced evidence from which a reasonable juror could find by clear and convincing evidence both that: (1) Allstate did not have a reasonable basis when it denied coverage for replacement of the entire roof and only agreed to provide coverage to repair or replace the slates that were actually damaged; and (2) Allstate knew or recklessly disregarded a lack of a reasonable basis in denying the claim. The minor issues Collins raises are clearly not sufficient to establish either of these factors by clear and convincing evidence and certainly not both. Collins's brief deals almost exclusively with the issues in the breach of contract claim and has little to say about the evidence that Allstate had in its file that provided a reasonable basis to deny the claim—which is the issue presently before the court. There is no evidence that Allstate's conduct was frivolous, unfounded, reckless, or motivated by ill will.

Courts have defined "bad faith" under Pennsylvania's bad faith statute, 42 Pa. C.S.A. § 8371, as "any frivolous or unfounded refusal to pay the proceeds of a policy." Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990). To succeed on a claim of bad faith, a plaintiff must present "clear and convincing evidence that 'the insurer did not have a reasonable basis for denying benefits under the policy *and* that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim.'" O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa. Super. Ct. 1999) (quoting MGA Ins. Co. v. Bakos, 699 A.2d 751, 754 (Pa. Super. Ct. 1997)) (emphasis added). It is a two-pronged test. Where a reasonable basis to deny the claim exists, the insurer

---

The court concludes that the issue of the correct interpretation of the Policy is a matter properly to be decided in adjudication of Collins's contract claim, Count I. The court further concludes, as is discussed in more detail below, that Allstate's interpretation of the terms "like" and "equivalent" to mean "similar," whether correct or not under the Policy, was not unreasonable and does not constitute bad faith.

will not be held to have acted in bad faith. Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 307-308 (3d Cir. 1995) (Pennsylvania law). An insurer will be held to have acted in bad faith, however, if it fails to "'accord the interest of its insured the same faithful consideration it gives its own interest.'" Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 752 (1994) (quoting Cowden v. Aetna Casualty and Surety Co., 134 A.2d 223, 228 (Pa. 1957)).

In Greene v. United Services Auto. Ass'n, 936 A.2d 1178, 1186 (Pa. Super. Ct. 2007), the Pennsylvania Superior Court upheld the trial court verdict that an insurance company was only required to repair the damaged slope of the insured's roof "with shingles similar to the damaged shingles in function, color, and shape." The homeowners argued, among other things, that the policy in question required replacement with shingles of "like construction" and that "because the damaged shingles on their home were no longer in production, like construction meant an entirely new roof, not a roof with mismatched shingles." Id. at 1185. The court affirmed the trial court's verdict that although the exact model of the damaged shingles was no longer in production, testimony at trial revealed that shingles of similar color, texture, function, and shape were, in fact, available, and that the use of such similar shingles met the parameters of "like construction" called for by the policy language:

> The policy clearly and unambiguously provides for "like construction," not replacement with the identical item damaged. We are satisfied that the repair of the damaged slope of Appellants' roof with shingles similar to the damaged shingles in function, color, and shape meets the parameters of "like construction" as called for by the policy language.

Id. at 1186. The court also noted that at most only the damaged slope, not the entire roof, could be considered to be the "part of the building damaged" under the terms of the policy in that case:

> Appellants contend that this policy language requires USAA to pay for the cost of replacing their entire roof because the roof was the "part of the building damaged." We find this interpretation of the policy language to be unreasonable

> and absurd. At most, the "part of the building damaged" in this case was one
> slope of Appellants' multi-sloped roof.

Id.

Like the roof in Greene, the roof of the Property in this case is multi-sloped. Given the similarity of the facts of Greene to the facts of this case, Allstate had a reasonable legal basis to deny coverage for more than the damaged slopes of the Property under the Policy.[7] Furthermore, Allstate has submitted evidence, which it considered in evaluating the claim, that before the March 8, 2008, storm the roof of the Property contained mismatched slates and did not have a uniform appearance. (Def.'s Am. Stmnt. of Facts ¶¶ 21-24 (Camp's estimate), 30-31 (Weiss's report); Duddy Dep. 67:15-24; Popolizio Report, photographs.) Collins disputes this but the issue before me at this point is whether Allstate had evidence before it that provided a reasonable basis to deny the claim.[8] Given Allstate's evidence, no reasonable juror could conclude that Allstate did not have a reasonable basis to deny coverage for more than the damaged shingles, and certainly could not conclude that Allstate knew or recklessly disregarded a lack of reasonable basis in denying the claim. The terms of the Policy in this case ("like kind and quality" and

---

[7] Collins claims that it is "undisputed" that all five of the slopes of the slate portion of the roof of the Property were damaged. (Pl.'s Mem 18.) This fact does indeed appear to be in dispute. Allstate's adjusters concluded that only three of those slopes were damaged. (Id. at Ex. A (Duddy Dep.) 62:20-63:10.)

[8] Collins claims that the roof did have a uniform appearance before the March 8, 2008, storm and implies that temporary replacement of some shingles on March 26, 2008, before Allstate inspected the Property, might have given the roof a non-uniform appearance. (Pl.'s Mem. 7 n.1.) These emergency repairs, however, replaced only slates that "were blown off roof" (Id. at Ex. B)—not all of the 54 slates listed in Camp's subsequent April 23, 2008, estimate as having been damaged (Def.'s Mem., Ex. M). Collins has not directed the court to any other evidence in the record to establish that the roof had a uniform appearance before the March 8, 2008, storm. Collins himself testified in his deposition that no repairs have been made to the roof since that time. (Collins Dep. at 38:18-42:4.) Collins has also not disputed the accuracy of the photographs attached to the Popolizio Report, which show mismatched slates and a roof that is not of uniform appearance. (Popolizio Report, photographs.)

"equivalent construction") are similar to the "like construction" term of the policy in Greene, which did not require "replacement with the identical item damaged," but only "repair of the damaged slope . . . with shingles *similar* to the damaged shingles." Greene, 936 A.2d at 1186 (emphasis added). It is clear that Allstate had a reasonable basis for its adjustment of Collins's claim, including: (1) the condition of the roof; (2) the investigation of adjusters Camp and Duddy; (3) the expert report of Weiss, and (4) the findings and photographs of Popolizio. There is no evidence that Allstate's denial of Collins's claim was frivolous, unfounded, reckless, or motivated by ill will.

Collins argues, however, that the deposition of Duddy was "devastating" to Allstate's defense. (Pl.'s Mem. 2.) Collins appears to base this assertion on only one exchange: when Duddy was asked if he could "think of any other reason why Allstate would refuse to replace the entire roof other than the sheer cost of it" he answered, "Can I think of any other reason on this claim, no." (Duddy Dep. 52:15-19.) Collins concludes that this answer must mean that Allstate only took cost into account when deciding the claim. (Pl.'s Resp. ¶ 14.) Although the court must and does consider the evidence in the light most favorable to Collins, no reasonable juror could reach the same conclusion as Collins because Collins only reaches it by describing Duddy's testimony incorrectly. In his description, Collins changes the wording of the question from "any other reason" to "a reason" or "any reason." (Id.; Pl.'s Mem. 17.) By eliminating the word "other," Collins's description changes Duddy's testimony significantly. Collins limits Duddy's testimony to a statement that Duddy could not think of "a reason" or "any reason" other than cost as to why Allstate refused to replace the entire roof. Duddy had already testified, however, as to "other" reasons why Allstate might have refused to replace the entire roof. Duddy had testified that in reviewing claims such as this one, he would review "quite a few criteria," including "the

type of roofing material, the age, the condition, the amount of damages," as well as "availability of a type of material," "the number of slopes that were damaged," and "the extent of damages per slope," (Duddy Dep. at 22:14-25:3.) Duddy had also testified that Allstate's policy does not allow him to "decide which repair method you're going to utilize based upon the cost." (Id. at 34:8-20.)[9] No reasonable juror could conclude that Collins has described Duddy's testimony correctly. Having submitted no other evidence to support the claim that Allstate only denied coverage of replacement of the entire roof because of cost, Collins has not submitted "clear and convincing" evidence upon which a reasonable juror could find that Allstate placed its own interests above Collins's.

Collins is also incorrect in characterizing Duddy's deposition as establishing that Allstate has a policy of "matching" damaged areas to undamaged ones, whether on the interior or the exterior of a building. No reasonable juror could find that Duddy so testified. Duddy stated that Allstate applies a variety of factors particular to each claim to determine whether or not matching is necessary. (Id. at 22:14-25:3; 28:20-29:3.) Duddy testified that Allstate's methods for determining coverage for interior and exterior damages "depend on the actual claim, the particular type of item you're talking about, industry standards, whether you're talking a component item versus a run of carpet versus floor, tile." (Id. at 111:11-23.) He testified that "[t]here's a whole host of things that go into that determination." (Id. at 111:23-24.) Indeed, Collins's own response to the renewed motion admits that Allstate does not have a universal

---

[9] Duddy also testified that he himself does not take cost of material into consideration "per se." (Pl.'s Mem, Ex. A (Duddy Dep.) at 55:4-10.) Duddy also clarified in his Errata Sheet that "Allstate did not refuse to replace the roof based on cost" and "Allstate paid for all the direct physical damage to the roof related to this loss." (Duddy Dep., Errata Sheet.) In addition, Duddy testified during this line of questioning that he was confused by the way Collins's attorney was phrasing the questions. (Id. at 52:14 ("You lost me."); 53:3 ("The cost, I don't know. Maybe you can rephrase that.").)

policy of matching.  Collins describes Duddy's testimony as stating that Allstate policy is to pay to replace undamaged portions of a building "to match the repairs of damaged areas *under certain circumstances*."  (Pl.'s Resp. ¶ 13 (emphasis added).)

Collins's argument that Duddy had a personal financial incentive to limit coverage of Collins's claim inappropriately is also unavailing.  The only evidence of such an incentive is that Duddy has some Allstate stock in his 401K retirement plan.  Duddy testified, however, that his participation in this 401K retirement plan "doesn't even enter into adjusting the claim."  (Id. at 99:15-22.)  Collins submits no evidence to the contrary.  Duddy also testified that he does not have "direct knowledge" of "whether the amount of money that Allstate pays out on claims affects their overall profitability for the purposes of affecting their stock value."  (Id. at 100:24-101:6.)  Collins submits no evidence that Allstate's stock value would have risen or fallen significantly as a result of Duddy's decisions concerning claims.  The impact on Duddy's 401k retirement plan of Duddy's decisions concerning claims is obviously *de minimus*.  It is ludicrous to suggest that Duddy's adjustment of this claim, amounting to a dispute of $22,000, could affect the value of the Allstate stock held in Duddy's 401k retirement plan.[10]  Duddy's financial interest in Allstate's success based on his 401k retirement plan is of little difference from the kind of general financial interest that all employees have in a company's success.  To ascribe bad faith to a company based only on such a weak motive goes too far.  No reasonable juror could do anything other than reject such an argument.

Duddy further testified that he did not recall ever being told that Allstate was changing the method by which it would pay claims, was paying too much money on claims, or had to

---

[10] Allstate is obviously a nationwide company with millions of claims to be adjusted each year.

become more profitable. (Id. at 103:23-105:13.) He also testified that he was never told that he needed to become more aggressive in how he adjusted claims, that he needed to scrutinize certain claims more closely, that certain types of claims should be handled differently from others, or that he should target claims under a certain value and adjust them differently. (Id.) Collins presents no evidence that would dispute this testimony.

In sum, there is no evidence from which a reasonable juror could conclude that Allstate's conduct was frivolous, unfounded, reckless, or motivated by ill will. Collins has failed to produce clear and convincing evidence from which a reasonable juror could find both that: (1) Allstate did not have a reasonable basis when it denied coverage for replacement of the entire roof and only agreed to provide coverage to repair or replace the slates that were actually damaged; and (2) Allstate knew or recklessly disregarded a lack of a reasonable basis in denying the claim. As a result, Collins cannot, as a matter of law, prevail on his bad-faith claim.

## IV. Conclusion

Despite having been afforded the opportunity to pursue depositions of representatives of Allstate and the lines of inquiry he identified in his Rule 56(f) motion, Collins has failed to raise a genuine issue of material fact with regard to Count II of his complaint. I will therefore grant Allstate's motion and will enter summary judgment in Allstate's favor as to Count II. An appropriate order follows.